190 P.3d 737

**Sabino CARBAJAL, Petitioner,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Phelps Dodge, Respondent Employer,**

**Gabb Robbins North America, Respondent Carrier.**

**No. 1 CA–IC 07–0054.**

Court of Appeals of Arizona, Division 1, Department E.

Aug. 26, 2008.

---

Law Office of Aida Rico By Aida J. Rico, Phoenix, Attorneys for Petitioner Employee.

Laura L. McGrory, Chief Counsel, The Industrial Commission of Arizona, Phoenix, Attorneys for Respondent.

Jardine Baker Hickman & Houston PLLC By Scott H. Houston, Phoenix, Attorneys for Respondents Employer and Carrier.

## OPINION

OROZCO, Judge.

¶ 1 This is a special action review of an Industrial Commission of Arizona (ICA) decision denying Sabino Carbajal's (Claimant) request seeking compensation from Gabb Robbins North America (Carrier) for care provided by Celia Carbajal (Wife) during the times in which no skilled attendant care is provided to Claimant. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Claimant sustained severe injuries to his head and spinal cord in an industrial accident on November 4, 1999. As a result of the accident, Claimant has right hemiparesis,[1] as well as problems related to his cognitive ability. Claimant is able to ambulate with a wheelchair or a walker. Claimant's injury was found to be compensable and Carrier accepted his claim for benefits.

¶ 3 In addition to his monthly loss of earning capacity (LEC) entitlement, Carrier provided Claimant with a wheelchair accessible van. Carrier also made special modifications to Claimant's home, which included adding tile to the floor of the house and making the bathroom and shower area handicap accessible. The bathroom was specifically designed so that Claimant could use it independently.

¶ 4 Additionally, Carrier provides Claimant with attendant care services seven days a week for eight to ten hours each day. Monday through Friday, an attendant arrives at Claimant's home at 6:00 a.m. to bathe, dress, and perform simple physical exercises with Claimant. Wife prepares Claimant's breakfast and administers his medication. At 8 a.m. the attendant takes Claimant to the adult day care rehabilitation center. In the afternoon, Claimant is picked up from the center and dropped off at his home at 3:30 p.m.[2] At 6:30 p.m., another attendant ar-

---

1. "Hemiparesis" is paralysis affecting only one side of the body. RightHealth, http://righthealth.com/Health/hemiparesis/-oddefinition_wiki_Hemiparesis-s (last visited July 28, 2008).

2. The dissent, *infra* ¶ 54, in arguing that the services provided are compensable, makes much of the fact that Wife "had to leave her full-time work to care for her husband." However, it was undisputed that Claimant was at the facility six to seven hours each day. Therefore, if Wife wanted to work, there was certainly time in the day for her to do so. Wife, however, has not sought employment since the injury and there are doubts whether she could secure employment given her own health issues. Consequently, while it is undisputed that Wife did not work outside the home following Claimant's accident,

rives and assists Claimant with his needs. After performing range of motion exercises with Claimant, the attendant prepares Claimant for bed and leaves at approximately 9:30 p.m.

¶ 5 On Saturdays, an attendant arrives at Claimant's home at 7:00 a.m. and stays for a couple of hours. After the attendant has left, Wife usually takes Claimant out to visit with family or the two will go out to eat. An attendant returns at 6:30 p.m. and stays with Claimant until approximately 9:30 p.m. On Sundays, an attendant arrives at 7:00 a.m. to take Claimant to church. Claimant is returned to his home at 1:00 p.m. An attendant returns at 6:30 p.m. for Claimant's normal evening routine.

¶ 6 In addition to the services provided daily to Claimant, a registered nurse visits with Claimant on a weekly basis to set up his medications, take his blood pressure, and check his temperature. The nurse is also available to Claimant should any significant health issues arise and will accompany him to the emergency room if need be.

¶ 7 On April 26, 2006, Claimant filed a request for investigation, pursuant to Arizona Revised Statutes (A.R.S.) section 23–1061(J) (Supp.2007), alleging that Carrier had refused to compensate Wife for the attendant care she provided. Claimant sought retroactive compensation for the care rendered by Wife during those hours when no attendant care was provided. At a hearing held on September 22, 2006, Claimant argued that compensating Wife was only fair since Claimant requires attendant care 24 hours a day, seven days a week. Wife testified that on weekdays, between 3:30 p.m. when Claimant returns from the day care center and 6:30 p.m. when the second attendant arrives, she sits him in his reclining chair, administers his medication, and feeds him dinner. Occasionally, Claimant will defecate or urinate on himself at the rehabilitation center and Wife will change his clothing and clean him up when he returns home in the afternoon. Wife also testified that, after the second attendant leaves for the night, she monitors Claimant's oxygen while he is sleeping and assists him when he has to use the bathroom,

which is often two to three times a night. Wife testified that, since Claimant's injury, she has had no life and likened caring for Claimant to having a child.

¶ 8 At a subsequent hearing held on November 22, 2006, Claimant's treating physician, Dr. Porter, testified that, although Claimant "cannot live alone" and must be "supervised for the most part," he does not require "skilled [care at all times] that you can get in someone who has a tracheostomy or need[s] tube feedings or things like that." For example, Dr. Porter testified that a family member familiar with his needs could help Claimant get up and use the bathroom or set up his meals during the hours in which no attendant care was provided to Claimant. This assistance, Dr. Porter explained, did not require a licensed health care provider or skilled caregiver, "just an attendant of sorts."

¶ 9 Registered Nurse Boggs (Boggs), the case manager who developed Claimant's attendant care plan with Dr. Porter, also testified at the November 22 hearing. Boggs testified that she would not change Claimant's attendant care plan. Boggs opined that Claimant was capable of doing some things for himself, but Claimant believes that the attendants should do these tasks for him since they are being paid. For instance, Boggs testified that Claimant has used the bathroom without assistance at home and at the day care center. She also testified that Claimant would not need to get up as much at night if he used a urinal placed by his bed, as he had previously done when Wife went to Mexico for a couple of weeks. Boggs testified that none of her other patients that are similarly situated to Claimant require "24–hour per day attendant care."

¶ 10 After considering all the evidence before him, the Administrative Law Judge (ALJ) found that Wife was not entitled to compensation for the care she provided Claimant and denied Claimant's request for investigation. The ALJ reasoned that "the care rendered by [Wife] is not of the type which necessitates a trained attendant, but rather is more closely akin to the day-to-day duties assumed by a spouse in accord with

the reason why and whether she is able to do so, are unclear from this record.

the marriage commitment." The ALJ summarily affirmed his award on administrative review, and Claimant brought this special action.

¶ 11 This court has jurisdiction pursuant to A.R.S. §§ 12–120.21(A)(2) (2003), 23–951(A) (1995), and Arizona Rules of Procedure for Special Actions 10.

## DISCUSSION

■ ¶ 12 Although deference is owed to the ALJ's factual findings on appeal, *PFS v. Indus. Comm'n*, 191 Ariz. 274, 277, 955 P.2d 30, 33 (App.1997), questions requiring the interpretation of a statute are issues of law, which we review de novo. *Schwarz v. City of Glendale*, 190 Ariz. 508, 510, 950 P.2d 167, 169 (App.1997). "When considering the facts of this case, we have been mindful of our duty to liberally construe the Act to effect its purpose of having industry bear its share of the burden of human injury as a cost of doing business. But, a 'liberal construction is not synonymous with a generous interpretation.'" *Putz v. Indus. Comm'n*, 203 Ariz. 146, 150–51, ¶ 24, 51 P.3d 979, 983–84 (App.2002)(quoting *Nicholson v. Indus. Comm'n*, 76 Ariz. 105, 109, 259 P.2d 547, 549 (1953)).

■ ¶ 13 Our workers' compensation statute provides that, "upon notice to the employer, every injured employee shall receive medical, surgical and hospital benefits or other treatment, nursing, medicine, surgical supplies, crutches and other apparatus, ... reasonably required ... during the period of disability." A.R.S. § 23–1062(A) (1995). In this case of first impression, we are asked to determine whether care provided by a spouse to an injured claimant in the marital home can be considered "other treatment" under A.R.S. § 23–1062(A). While in other circumstances we might be compelled to hold otherwise, we conclude that, under the facts of this case, the care rendered by Wife did not fall within the ambit of medical care contemplated by A.R.S. § 23–1062(A).

¶ 14 Courts were initially reluctant to embrace the idea of compensating a spouse who is not a licensed health-care practitioner for care provided to an injured claimant "on the ground that the [spouse] did no more than he or she was bound to do as an affectionate member of the family." 5 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 94.03(4)(b) (2007). Many jurisdictions have abandoned that view and permitted compensation to a spouse on the ground "that the services required were of an extraordinary nature and not those contemplated by the usual marital relationship." *A.G. Crunkleton Elec. Co. v. Barkdoll*, 227 Md. 364, 177 A.2d 252, 255 (1962); *see, e.g., Oolite Rock Co. v. Deese*, 134 So.2d 241, 243–44 (Fla.1961). Those courts have considered a number of factors in determining whether spousal care is compensable including: whether the services are those typically performed by licensed health practitioners; whether the services were performed under medical direction; and whether the claimant needs continuous care. *See Warren Trucking Co. v. Chandler*, 221 Va. 1108, 277 S.E.2d 488, 493 (1981); *Close v. Superior Excavating Co.*, 166 Vt. 318, 693 A.2d 729, 731 (1997).

¶ 15 Two cases illustrate the framework under which courts employing this approach analyze the issue of spousal care. In *Warren Trucking*, the claimant suffered injuries to his head and neck as a result of an industrial accident. 277 S.E.2d at 489. After the accident, the claimant had a series of dizzy spells and frequently blacked out, which forced him to remain home under his wife's care. *Id.* at 490–91. The claimant requested compensation for the attendant care provided to him by his wife, which consisted of "bathing, shaving, feeding, assistance in walking, help with braces, aid upon falling, driving and administering routine medication." *Id.* at 489, 494. The Virginia Supreme Court, in reversing the compensation award, held that such services were "not beyond the scope of normal household duties." *Id.* at 494. Nor were the services "of the type usually rendered only by trained attendants." *Id.*

¶ 16 In *Close*, the claimant sustained a severe head injury in an industrial accident. 693 A.2d at 730. The claimant required 24-hour attendant care as a result of the accident, which left him subject to seizures, disorientation, and memory loss. *Id.* The claimant's wife provided full-time care to him

at their home. *Id.* The wife's duties were assigned to her by the claimant's physicians and included administering and monitoring his medications, changing the doses of his medication, maintaining a log of the claimant's behaviors, and assisting the claimant during seizures. *Id.* The claimant sought compensation for the care rendered by his wife. *Id.* The Vermont Supreme Court held that the wife's services were compensable. *Id.* at 732. Of particular significance to the court was the fact that the claimant's physicians regarded the duties performed by the wife as those which would typically be rendered by a nurse. *Id.* at 731–32. Moreover, given the claimant's seizure activity, he required attendant care 24 hours a day. *Id.* at 731; *see also Kenbridge Constr. Co. v. Poole,* 25 Va.App. 115, 486 S.E.2d 567, 569 (1997) (finding "extensive" services provided by the claimant's wife compensable when she received significant medical training in order to care for him and the care provided was of the type usually performed by skilled attendants, which included monitoring the claimant's heart rate and blood pressure, administering suppositories and enemas, and monitoring his medications).

¶ 17 The dissent, infra ¶ 40, maintains that we misinterpret A.R.S. § 23–1062(A) because we interpret "other treatment" to mean "other [medical] treatment," which presumably would not cover the services performed by Wife. The dissent calls our reading of the statute "superfluous." However, one of the cardinal rules of statutory interpretation provides that "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed." Black's Law Dictionary (8th ed.2004) (defining principle of *ejusdem generis*). Section 23–1062(A) states that "upon notice to the employer, every injured employee shall receive medical, surgical and hospital benefits or other treatment, nursing, medicine, surgical supplies, crutches and other apparatus, . . . reasonably required . . . during the period of disability." A.R.S. § 23–1062(A) (emphasis added). In light of the rule of *ejusdem generis,* the words preceding "other treatment," "medical, surgical and hospital," suggest that the legislature intended the

statute to cover treatment or benefits of the "medical" type and not services which would normally be rendered by a spouse during a marriage.

¶ 18 The dissent, *infra* ¶ 41, further argues that we are not free to rely on rules of statutory interpretation when a statute, like A.R.S. § 23–1062(A), is "clear on its face." However, we do not believe the language of A.R.S. § 23–1062(A) is as clear and unambiguous as the dissent suggests, and therefore, find it appropriate to apply the principle of *ejusdem generis* to this statute. The ambiguity of the phrase is punctuated by the use of the adjective, "other," and must, therefore, be read in relation to the words preceding it.

¶ 19 We find support for our interpretation of A.R.S. § 23–1062(A) in *Hughes v. Industrial Commission,* 188 Ariz. 150, 933 P.2d 1218 (App.1996). In *Hughes,* this court held that "other treatment" did not encompass child care services for purposes of benefits under A.R.S. § 23–1062(A). 188 Ariz. at 153–54, 933 P.2d at 1221–22. The claimant argued that "child care [was] reasonably required other treatment because it [was] necessitated by and necessary to treat her industrial injury." *Id.* at 153, 933 P.2d at 1221. Applying the principle of *ejusdem generis* to A.R.S. § 23–1062(A), this court concluded that the statute did not extend to child care because it was not of the same type or class as the specifically enumerated services. *Hughes,* 188 Ariz. at 154, 933 P.2d at 1222. The court reasoned that child care was a service "not generally considered *medical treatment.*" *Id.* (Emphasis added.)

¶ 20 Likewise, the services rendered by Wife in this case are not generally considered medical treatment. Contrary to the dissent's assertion, *infra* ¶ 51, the services provided by Wife in this case were not the type of services typically rendered by a nurse, as in *Close.* In *Close,* the physician concluded "that if only one person were to be in attendance, that person should be capable of providing skilled nursing care." 693 A.2d at 732. In this case, there was no such conclusion by Claimant's physician. In fact, as previously stated, Claimant only required "an attendant of sorts," not someone capable of

providing skilled nursing care, during the times in which no attendant care was provided. The services provided by Wife more closely resemble the ordinary services provided by the claimant's wife in *Warren Trucking* than they do the extensive services provided in *Close* and *Poole*. Here, Wife prepared Claimant's meals, cleaned him up if he was dirty, drove him to visit with family on the weekends, assisted him in using the bathroom at night, and monitored his oxygen while he was asleep. As in *Warren Trucking*, the services provided to Claimant were not of the type typically performed only by trained attendants.

¶ 21 Furthermore, the ALJ determined that none of the care rendered by Wife to Claimant was "of the type which necessitates a trained attendant," nor under the direction or control of Claimant's physicians. The extent of the training Wife required[3] was limited to instruction on how to operate Claimant's oxygen machine and did not rise to the level of the significant training received by the spouses in *Close* and *Poole*. For example, in *Poole*, the claimant fractured his skull during an industrial accident and, as a result, suffered from cognitive brain damage. 486 S.E.2d at 568. His caretaker wife was assigned a number of tasks, all under the direction and control of the claimant's physicians. *Id.* To carry out these tasks regularly, the claimant's wife was "trained to administer enemas and suppositories, take stool samples, take blood pressure readings, and monitor heart rates." *Id.* She also received cardiopulmonary resuscitation (CPR) training. *Id.* Additionally, the wife remained in close contact with the claimant's physicians, monitored his medications, and performed physical therapy with him. *Id.* at 568–69.

¶ 22 Finally, contrary to the dissent, *infra* ¶¶ 52–53, Claimant does not require continuous 24-hour skilled attendant care. Dr. Porter testified that although Claimant needed to be supervised for the most part, he did not need constant "skilled" care. Dr. Porter opined that much of the care provided to Claimant, beyond the attendant care services he received, could be rendered by a family member and not a health care provider or skilled caregiver, "just an attendant of sorts." Dr. Porter's testimony was consistent with his previous medical reports. In one report, Dr. Porter stated that Claimant was "capable of living independently." In another report, Dr. Porter suggested that there was no need for skilled care during the hours in which no attendant care was provided:

> I do not see where the patient would need as far as the 3:30 through 6:30, [sic] this is my understanding when he would be watching television or spending time with … his family including his wife and would be fixed dinner. I do not see a skilled need to actually perform there, but again if [Wife] is not able to perform that someone in the family would.

Furthermore, Boggs, who developed Claimant's attendant care plan with Dr. Porter, testified that the attendant care plan was "working well" and did not need to be modified. She also testified that Claimant could do a lot on his own, but chose to allow others to do it for him since they were being paid. Boggs further testified that, compared to other individuals similarly situated to Claimant, Claimant receives more assistance from Wife because "he is demanding of her" and "is a very difficult man [who] demands that he be waited on."[4]

¶ 23 We do not share the dissent's view, *infra* ¶ 55, of implications that our holding

---

3. The dissent, *infra* ¶¶ 27, 47, contends that it is "undisputed" that Wife was trained to move Claimant out of bed without injuring him. However, Wife never testified to such. Dr. Porter testified that he "assumed" that she had received training, but was not certain.

4. That an insurance carrier, as argued by the dissent, *infra* ¶ 33, would pay family members in other cases to care for an injured person if no agency was involved to render attendant care is irrelevant in the case at hand. Boggs testified that there are similarly situated individuals whose family members take care of them and, in turn, are compensated by the insurance carrier. But they are only compensated because no agency is involved in caring for their injured spouses. So while it is "undisputed" that the carrier would pay a family member if no agency is involved, the insurer is not required, as in this case, to pay a family member to care for an injured spouse if that spouse is already receiving a significant amount of attendant care.

will have for the worker's compensation system in Arizona. That is, our holding will not permit carriers to .neglect their statutory duties to provide all necessary medical services to injured employees if the carrier determines that the claimant has a spouse or family member who could render such services. As. stated earlier in the opinion, had the facts of the case been different, we may have held otherwise. But, under the facts of this case, Claimant was not entitled to compensation for the services Wife provided during those hours in which he received no paid attendant care. If "other treatment" should encompass services rendered by a spouse to the other spouse of the sort typically provided in a marriage, then we invite the legislature to amend A.R.S. § 23–1062(A) to so state. *See Hughes,* 188 Ariz. at 154, 933 P.2d at 1222 ("The legislature alone may increase disability compensation."). But that is not for us to decide. Accordingly, we conclude that the ALJ did not err in finding that the services provided by Wife to Claimant were more akin to ordinary household duties than services typically provided by skilled attendants.

## CONCLUSION

¶ 24 For the aforementioned reasons, we affirm the ALJ's decision denying Claimant's request for investigation under A.R.S. § 23–1061(J).

CONCURRING: MAURICE PORTLEY, Judge.

KESSLER, P.J., dissenting.

¶ 25 I respectfully dissent. The question presented is whether a spouse who quits her full-time job to provide extensive attendant care for her partially paralyzed husband is merely performing duties commonly expected of a spouse or is performing "other treatment" compensable under Arizona Revised Statutes ("A.R.S.") section 23–1062(A) (1995). In this case, the spouse provided extensive care for her disabled husband—dressing him, cutting up his food, bathing him, cleaning

him when he soils himself, waking up in the middle of the night to get him to the bathroom, giving him medications, checking his oxygen tanks, cleaning his urinal, and supervising him so that he does not fall and hurt himself. All of these duties were medically necessary because the husband cannot be left alone unsupervised. Moreover, the caretaker spouse was paid by the workers' compensation carrier to be trained to do some of these duties and it is undisputed that the insurer has and would have to pay for such care if it were not provided by a spouse. Given that this case involves interpretation of a statute we are required to construe liberally to provide compensation, I agree with decisions of other modern courts that this kind of trained attendant care is compensable as "other treatment" and not merely a "duty" of a spouse which is expected as part of the marital commitment.

## FACTUAL AND PROCEDURAL HISTORY

¶ 26 The facts in this case are essentially undisputed. Mr. Carbajal was severely injured in a 1999 compensable, work-related accident for which compensation has been provided under our workers' compensation laws. He suffered head and spinal injuries. He now has right hemiparesis with residual spasticity into and weakness of the arm and leg and has cognitive problems, although he can let people know his needs. The only physician to testify was Mr. Carbajal's treating physician. He stated that while Mr. Carbajal was continent and has an idea of some basic functions, "[h]e cannot live alone" and needs twenty-four hour a day, seven-day a week supervision because he is at risk of falling if he tries to get up and stand. The doctor testified Mr. Carbajal cannot bathe himself, cannot dress himself, has to have someone get him out of bed and to get him to the bathroom especially because someone of Mr. Carbajal's age will have to go to the bathroom in the middle of the night.[5] Mr. Carbajal also has a tendency to choke on his

---

5. A nurse case manager involved with Mr. Carbajal's care testified without contradiction that while Mr. Carbajal's bathroom had been modified so that he could use it independently and he

had been able to go to the bathroom independently, he had recently broken three toilet seats at a care center and now had to have someone help him sit down to use the toilet.

food so the food has to be set up for him. Thus, as the physician testified, it is undisputed and was found by the administrative law judge, Mr. Carbajal has to have someone help him all the time in some capacity or be supervised in a group setting.

¶ 27 Mr. Carbajal's treating physician's report stated that some of the attendant care Mr. Carbajal needs requires skilled activity and not just supervision. While the doctor testified that the care and supervision need not be by a medically trained person or on a one-to-one basis, he clarified that Mr. Carbajal cannot bathe himself completely, he cannot dress himself, he has to have someone help him get out of bed if he needs to go to the bathroom and he is not able to do a lot of things himself but can voice them when he needs them. The treating physician further testified that anyone who bathed and cleaned Mr. Carbajal had to be a professional and understand how to do that with his disabilities and challenges, although that could be done by a family member if they were able to do that.[6] It was undisputed that Mrs. Carbajal received training in how to transport her husband from a bed into a wheelchair and get him to the toilet as well as how to check and maintain his oxygen tank at night. It would have been dangerous for Mr. Carbajal if the oxygen tanks did not work properly. The carrier paid for that training.

¶ 28 Mr. and Mrs. Carbajal lived in Bagdad, Arizona at the time of the industrial accident. While the Carbajals lived in Bagdad, the respondent employer and insurer ("insurer") were providing professional help for Mr. Carbajal through an agency in Phoenix and even paid for an apartment for Mr. Carbajal's attendants in Bagdad. The insurer does not dispute that attendant service was compensable. Mr. Carbajal was placed into care centers both while he was in Bagdad and later in Scottsdale.

¶ 29 Mrs. Carbajal quit her full-time job to provide attendant care for her husband while he is not in the care center. The insurer pays for attendants to pick Mr. Carbajal up and take him to and from the care center and provides attendant care for several hours a day. The insurer does not dispute that the services those attendants provide is compensable. If those attendants do not arrive or are late, Mrs. Carbajal must provide their services, although this happens less often in Phoenix. During those times, Mrs. Carbajal does everything the attendants paid by the insurer would normally do.

¶ 30 The typical weekday for the Carbajals is as follows. Attendants arrive at the Carbajals' home at approximately 6 a.m., get him up and do his shower, and help him get ready to go to the care center. This includes helping him use his walker. Mrs. Carbajal feeds him and gives him his medications. The attendants then take him in a van to the care center. At about 3:30 in the afternoon, the attendants pick him up at the care center, drive him home, and then leave. Mrs. Carbajal is then left alone with Mr. Carbajal and often has to clean him up because he has soiled himself at the care center. She also has to feed him,[7] remove his brace and change his clothes. At about 6:30 in the evening, an attendant arrives and stays with the Carbajals until about 9:30 p.m. when the attendant gets him ready for bed. From 9:30 p.m. until the next morning, Mrs. Carbajal is the sole caregiver for Mr. Carbajal.

---

6. The majority quotes from the doctor's testimony that Mr. Carbajal did not need a licensed health care provider or skilled caregiver, just an attendant. *Supra,* ¶ 8. The record is slightly different however. The full testimony was:

Q. Do you picture this person as a licensed health care provider or skilled caregiver?
A. *Not all the time, no.* I believe maybe some of these things, just an attendant of sorts. And we have attendants that are really not, for instance, skilled nurses or things like that that tend to his needs.
Q. And you have outlined in your report that you thought that this could be done by a family member that's familiar with his needs?

A. *If they're able to do that. Yes.*
Emphasis supplied.
Equally important, in both his report and testimony, the physician explained that the seven days a week attendant care Mr. Carbajal requires *"is skilled activity* that requires more than just supervision" and Mrs. Carbajal was trained to move her husband from the bed and thought that nurses had educated Mrs. Carbajal on how to care for her husband. (Emphasis supplied).

7. I assume that this means cutting up his food because the physician witness testified that had to be done because Mr. Carbajal could choke when swallowing.

Mrs. Carbajal has to wake up in the middle of the night to assist her husband into a wheelchair to go to the bathroom to move his bowels. Mr. Carbajal has to go to the bathroom several times a night and sometimes is there for up to forty-five minutes. If he soils himself, Mrs. Carbajal has to clean him up. While Mr. Carbajal can use a urinal to pass urine, he sometimes has spills and Mrs. Carbajal has to clean him up and change the sheets. During the night, Mrs. Carbajal also has to check Mr. Carbajal's oxygen tanks to make sure they are working properly and adjust them.

¶ 31 During the weekends, their routine is slightly different. On Saturdays, Mr. Carbajal does not go to the care center and the paid attendant arrives at approximately 7 a.m. and attends to Mr. Carbajal until about 9:30 a.m. Mrs. Carbajal must then care for Mr. Carbajal until about 6:30 p.m. when the attendant returns with the attendant leaving around 9:30 p.m. On Sundays, the attendant takes Mr. Carbajal to his church and is with him from around 7 a.m. until 1 p.m. and then again from approximately 6:30 p.m. to 9:30 p.m.

¶ 32 Mrs. Carbajal pithily described the care she provided by explaining that this was not the man she married, it was more like taking care of a child.

¶ 33 The undisputed evidence is that the insurer would pay for family members in other cases to provide such service when no agency could provide attendant care.

¶ 34 The Carbajals initiated an investigation whether the above attendant services provided by her were compensable under section 23–1062(A). Mrs. Carbajal sought compensation for the attendant care she provided for three hours a day during the weekdays when she has to care for Mr. Carbajal without any attendant care and for the evenings when she has to get him into his wheelchair to go to and from the bathroom, ensure the oxygen tanks are working properly and clean up after him if he soils himself or spills the urinal. The respondents do not seem to dispute that the care at issue was reasonable, that they were obligated to pay for such care if provided by attendants or an agency or for such care if it was provided in a care center. Respondents appear not to dispute that when such care was provided by agencies, they paid for it.

¶ 35 An evidentiary hearing was held. After noting that there was really no factual dispute, the ALJ determined that the above attendant care provided by Mrs. Carbajal was not "other treatment" under the statute because it was care that was traditionally expected to be provided as part of a marriage commitment. The ALJ added that such care was not compensable even though a paid attendant would be required in Mrs. Carbajal's absence.

## DISCUSSION

¶ 36 We defer to the ALJ's factual findings and consider the evidence in the light most favorable to upholding the award. *PF Chang's v. Indus. Comm'n*, 216 Ariz. 344, 347, ¶ 13, 166 P.3d 135, 138 (App.2007). Where the material facts are undisputed, the issue becomes a question of law which we review independently. *Id.; Finnegan v. Indus. Comm'n*, 157 Ariz. 108, 109, 755 P.2d 413, 414 (1988). In construing the statute, we interpret it "liberally, remedially, and in a manner ensuring that injured employees receive maximum available benefits" because the overriding purpose of the workers' compensation system is to provide a claimant the opportunity to be made whole to the fullest possible extent. *Aitken v. Indus. Comm'n*, 183 Ariz. 387, 392, 904 P.2d 456, 461 (1995). Clear and unambiguous statutory language must be "given its plain meaning unless absurd or impossible consequences will result." *Dunn v. Indus. Comm'n*, 177 Ariz. 190, 194, 866 P.2d 858, 862 (1994). We must construe the workers' compensation statutes to give effect to the legislative intent of placing the burden of injury on the industry. *Id.* Where there is any ambiguity or doubt in the statutory language, we must construe it in favor of compensability to relieve employees of the burden of compensable injury. *Wiley v. Indus. Comm'n*, 174 Ariz. 94, 99–100, 847 P.2d 595, 600–01 (1993); *Mead v. American Smelting & Refining Co.*, 1 Ariz.App. 73, 76, 399 P.2d 694, 697 (1965) (citing *English v. Indus. Comm'n*, 73 Ariz. 86, 89, 237 P.2d 815,

817 (1951)). In construing the act, we of course begin with the express language of the statute. *Wiley,* 174 Ariz. at 97, 847 P.2d at 598. As with other statutes, we must give meaning to each word in the statute, not making any of them superfluous. *Obregon v. Indus. Comm'n,* 217 Ariz. 612, 614–15, ¶¶ 11, 16, 177 P.3d 873, 875–76 (App.2008).

### 1. Statutory Interpretation

¶ 37 Here, as the ALJ noted, the facts are really not in dispute. Thus, the issue presented is one of statutory interpretation, *Finnegan,* 157 Ariz. at 109, 755 P.2d at 414; *PF Chang's,* 216 Ariz. at 347, ¶ 13, 166 P.3d at 138, which we must construe liberally in favor of compensability and making the employee whole from his compensable injuries. *Aitken,* 183 Ariz. at 392, 904 P.2d at 461; *Dunn,* 177 Ariz. at 194, 866 P.2d at 862; *Wiley,* 174 Ariz. at 99–100, 847 P.2d at 600–01.

¶ 38 The issue presented is what "other treatment" means in section 23–1062(A). That statute provides, in pertinent part, that

> upon notice to the employer, every injured employee shall receive medical, surgical and hospital benefits *or other treatment,* nursing, medicine, surgical supplies, crutches and other apparatus ... reasonably required ... during the period of disability. (Emphasis supplied).

¶ 39 The majority concludes that the term "other treatment" must mean "other medical treatment." *Supra,* ¶ 17. While I agree with the majority that the term "other treatment" cannot mean other normal housekeeping functions which spouses expect to do for and with each other, such as cleaning, cooking, taking out the garbage and normal household repairs, I conclude that "other treatment" includes the other types of attendant care Mrs. Carbajal provided, including the on-call care at nights and that such care is not normal "services" which a married couple expect each other to perform. I reach this conclusions for several reasons.

¶ 40 The majority's conclusion misinterprets section 23–1062(A). As noted above, § 23–1062(A) does not provide compensation for "other medical treatment"; it provides for compensation for "medical, surgical and hospital benefits *or other treatment.*" (Emphasis supplied). By adding the term "medical" to "other treatment," the majority adds words the legislature could have added, but did not. Indeed, the majority's construction of the statute would render the term "other treatment" superfluous because medical benefits are already covered by the statute. *Obregon,* 217 Ariz. at 614–15, ¶¶ 11, 16, 177 P.3d at 875–76 (court should interpret statute to give meaning to each word, not making any word superfluous or duplicative). Even if the statute were ambiguous, which it is not, the majority's construction of the statute also narrowly interprets the workers' compensation statutes when we are required to interpret them liberally to provide compensation. *Aitken,* 183 Ariz. at 392, 904 P.2d at 461; *Dunn,* 177 Ariz. at 194, 866 P.2d at 862; *Wiley,* 174 Ariz. at 99–100, 847 P.2d at 600–01.

¶ 41 The majority contends that its interpretation of the statute is guided by the principle of *ejusdem generis* so that the reference to "medical, surgical and hospital" also modifies the term "or other treatment." *Supra,* ¶¶ 17–18. There are at least three problems with that argument. Initially, when a statute is clear on its face, we are bound by what the legislature has said and are not free to interpret it by applying rules of interpretation. *Kimu P. v. Ariz. Dep't of Econ. Sec.,* 218 Ariz. 39, 43, ¶ 16, 178 P.3d 511, 515 (App.2008). *See also State v. Christian,* 205 Ariz. 64, 66, ¶ 6, 66 P.3d 1241, 1243 (2003); *Dunn,* 177 Ariz. at 194, 866 P.2d at 862. As the Arizona Supreme Court noted in rejecting an *ejusdem generis* argument to a clear constitutional provision, "venerable principles of statutory construction [would be violated because] '[w]here a constitutional provision is clear, no judicial construction is required or proper.'" *State v. Roscoe,* 185 Ariz. 68, 71, 912 P.2d 1297, 1300 (1996) (quoting *Pinetop-Lakeside Sanitary Dist. v. Ferguson,* 129 Ariz. 300, 302, 630 P.2d 1032, 1034 (1981)). This is because the ultimate goal is to give effect to the legislative intent and the best guide for such goal is the clear language of a statute. *United Dairymen of Arizona v. Rawlings,* 217 Ariz. 592, 596, ¶ 12, 177 P.3d 334, 338 (App.2008). Here, the language is

clear—the legislature used the terms "medical, surgical and hospital benefits or other treatment." If it had wanted to limit the compensability of services to "medical, surgical and hospital benefits or treatments," it would have not added "or other treatment." Applying *ejusdem generis* here would render "other" superfluous. *Obregon,* 217 Ariz. at 614–15, ¶¶ 11, 16, 177 P.3d at 875–76.[8]

¶ 42 Additionally, *Hughes v. Indus. Comm'n,* 188 Ariz. 150, 153–54, 933 P.2d 1218, 1221–22 (App.1996), cited by the majority in ¶ 19 does not assist the majority's *ejusdem generis* analysis because it was premised on rejecting care for a third person, not the claimant. As the majority explains, *Hughes* involved a request for child care expenses so that the claimant could go and receive medical treatment for her industrial injury. *Id.* The court in *Hughes* noted that the statute had to be interpreted liberally to provide compensation, noting that "other" types of services needed by a claimant to obtain compensable services were in themselves compensable as "other services," such as a new van for the claimant to get services or travel reimbursement for obtaining covered treatment. *Id.* at 153, 933 P.2d at 1221 (citing *Terry Grantham Co. v. Indus. Comm'n,* 154 Ariz. 180, 183, 741 P.2d 313, 316 (App.1987) and *Martinez v. Indus. Comm'n,* 175 Ariz. 319, 322, 856 P.2d 1197, 1200 (App. 1993)). Clearly a van or travel is not "medical service." The court then held that child care expenses were distinguishable because "[c]hild care, in contrast, is a service *provided to a third person,* not to the injured worker. The services itself is not generally considered medical treatment." *Hughes,* 188 Ariz. at 154, 933 P.2d at 1222 (emphasis supplied). Here, in contrast, the care was for the claimant, not a third person.

¶ 43 Moreover, even if we were to narrowly interpret "other treatment" to mean only "medical, surgical [and] hospital benefits [and] treatment," the record shows that the care provided by Mrs. Carbajal was not merely those of one spouse for another in the everyday marital situation, but involved some skilled attendant care well beyond the normal marital situation. It included checking Mr. Carbajal's oxygen tanks, providing all night supervision and assisting him to get out of bed and go to and from (and in the bathroom) so that he would not fall, cutting up his food, and cleaning him when he soiled himself. This is the same type of necessary, compensable care which would have been provided by third persons paid by the insurer if Mrs. Carbajal were not present or able to perform them.

¶ 44 The majority's erroneous interpretation of the statute is highlighted by its reliance on *Warren Trucking Co. v. Chandler,* 221 Va. 1108, 277 S.E.2d 488 (1981), and *Kenbridge Const. Co. v. Poole,* 25 Va.App. 115, 486 S.E.2d 567 (1997). In *Warren Trucking,* the Virginia Supreme Court held that attendant care similar to the care provided here was not compensable unless it was medical in nature, that is, it had to be provided by someone with a medical background or subject to the direction and control of a physician. 277 S.E.2d at 493. In *Kenbridge,* the court found that more medically-oriented services were compensable. 486 S.E.2d at 569–70. Those conclusions may be correct under Virginia law because the court was construing a statute which was significantly different than our statute. The Virginia statute limited compensation to services provided by "a physician . . . and such other necessary *medical attention,* . . . as the nature of the injury may require . . . and in addition, such surgical and hospital service and supplies as may be deemed necessary by the attending physician. . . ." 277 S.E.2d at 492 (quoting Va.Code Ann. § 65.1–88) (emphasis supplied). In stark contrast, our statute is much broader, not limiting care to medical treatment but providing compensation for "medical . . . benefits or *other* treatment[.]" A.R.S. § 23–1062(A) (emphasis supplied). We should not rely on statutes from other jurisdictions in which the statutory language

8. The majority's argument that simply because it comes to a different conclusion as to the clarity of the statutory language means that the language is not clear has little significance. On that theory, a majority of a divided court could substitute its views of what the law should be in lieu of legislative intent simply by concluding that its erroneous reading of a clearly written statute makes the statute "unclear."

is significantly different than our own. *Tartaglia v. Indus. Comm'n,* 177 Ariz. 199, 200–01, 866 P.2d 867, 868–69 (1994).

¶ 45 Moreover, the majority's conclusion has an inherent contradiction; if attendant services are not "other treatment," then why would an insurer have to pay for the exact same care by third persons regardless of their medical training simply because they are not the spouse of the injured person, e.g., third party home-caregivers or care facilities?

## 2. The Court's Conclusion Conflicts with the Majority of Modern Courts

¶ 46 Many jurisdictions across the country have held that the kind of care provided here is compensable under their workers' compensation statutes as care not normally provided by a spouse as part of the marriage commitment. *See* Warren J. Appel, Annotation, *Workers' Compensation: Recovery for Home Service Provided by Spouse,* 67 A.L.R.4th 765, §§ 9–10 (1989 and 2007 Supp.) ("Appel"). *See also* 82 AM.JUR.2D *Workers' Compensation* § 453 (2008) (several courts have held that services in the nature of nursing care provided to an injured worker by his or her spouse are generally compensable as medical benefits; "such duties as shopping or cooking have been deemed ordinary and therefore noncompensable services, while assistance in bathing, dressing, toileting, and moving about the house has in several cases been held compensable.").

¶ 47 Several cases show that the types of services here should be compensable under our "other treatments" standard. In *Close v. Superior Excavating Co.,* 166 Vt. 318, 693 A.2d 729 (1997), the injured spouse had a severe head injury and needed supervision 24–hours a day. He could not take medication on his own, could not prepare his own meals and could not dress himself without

assistance. 693 A.2d at 730. The claimant's wife provided tasks assigned to her by claimant's physician including administering and monitoring medications, keeping a log of her husband's behavior and being on-call in case he needed assistance. *Id.* This is similar to the factual scenario here in which Mrs. Carbajal had received training paid for by the carrier on how to move her husband from bed to a wheelchair. She also had been trained to test his oxygen tanks at night, and had to be on call all night because he was subject to falling and she would have to help him go to the bathroom. She also had to cut up his food, give him his medications and clean him if he soiled himself.

¶ 48 The court in *Close* had to apply a statute which provided for compensation for "reasonable surgical, medical and nursing services." *Id.* at 731. It rejected *Warren Trucking* and affirmed the award compensating for nursing services, noting that the spousal care went beyond ordinary household duties and that courts had interpreted "nursing services" to include services such as 24–hour care, bathing, giving medications, emptying urinals, assisting in moving, assisting in dressing and going to the bathroom and the need for on-call care. *Id.* at 731–32 (collecting cases). Here, of course, the case is stronger for compensating Mrs. Carbajal for those exact services because the statute includes, but is not limited to, "nursing" services, but also expressly provides compensation for "other treatment." Indeed, the leading authority on workers' compensation laws explains that while normal household duties would not qualify for compensation, the majority of courts now hold that duties by a spouse which are more like "nursing" duties are compensable. 5 ARTHUR LARSON AND LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAWS § 94.03[4][b] and [d] (2007) ("Larson").[9]

---

9. The majority contends that the care Mrs. Carbajal provided is not like services typically rendered by a nurse as in *Close. Supra,* ¶¶ 20–21. Unlike our statute, the statute in *Close* limited compensable services to "surgical, medical and nursing services." 693 A.2d at 731. Moreover, some of the services provided in *Close* were practical nursing duties, just like Mrs. Carbajal provided. *Id.* at 730–31. Contrary to the major-

ity's discussion, Mr. Carbajal's treating physician said that the attendant care was not simply supervision, but required "skilled activity," and while the attendant care needed at home was not necessarily one-on-one care by a healthcare provider, it could be done by family members only if they could do it. *Supra,* ¶¶ 26–27 & nn. 5–6. Training was required for moving Mr. Carbajal out of bed to get him to a bathroom without

¶ 49 Similarly, in *Edward Kraemer & Sons, Inc. v. Downey*, 852 P.2d 1286, 1288–89 (Colo.Ct.App.1992), the court held that a carrier had to compensate a claimant for a spouse's assistance in eating, bathing, preparing him for bed at night and showering. It also held that compensation was due for the spouse being available on an on-call basis in case her husband had an emergency even if she was also doing household work at the same time. As the court reasoned, a third-party attendant being on-call would be entitled to payment even if he or she could do other activities and in either case the caregiver was passively providing attendant care. 852 P.2d at 1289; *see also Brown v. Eller Outdoor Adver. Co.*, 111 Mich.App. 538, 314 N.W.2d 685, 687–88 (1981) (on-call services of wife can be compensable even if wife could perform household chores during that period).

¶ 50 In *Kushay v. Sexton Dairy Co.*, 394 Mich. 69, 228 N.W.2d 205 (1975), the husband had become permanently disabled by a compensable injury. He spent most of his time in bed and moved about only in a wheelchair or with canes. He suffered from pain in his legs from squeezing of the spinal nerves. 228 N.W.2d at 207. His wife bathed him, helped him dress, gave him medication, served meals in bed, helped him to the bathroom, and drove him to appointments. *Id.* The relevant statute provided that compensable care included "reasonable medical, surgical and hospital services and medicines or other attendance or treatment recognized by the laws of this state as legal, when they are needed." *Id.* at 206 (internal quotations omitted). The workers' compensation appeals board rejected the claim for compensation on the ground that her services were those any dutiful wife would provide her husband. *Id.* The supreme court reversed. Reviewing prior cases which appeared to be irreconcilable with the appeals board's decision, the court attributed the conflict to the standard of "whether the services are beyond ordinary wifely duties or conversely, those which any conscientious wife would give her husband[.]" *Id.* at 208 (internal quotations

omitted). The court held that the language of the statute "focuses on the service provided, not the status of devotion of the provider." *Id.* It held that while ordinary household tasks are not within the statute, those services would include house cleaning, preparation of meals and washing of clothes. In contrast, serving "meals in bed and bathing, dressing, and escorting a disabled person are not ordinary household tasks. That a 'conscientious' spouse may in fact perform these services does not diminish the employer's duty to compensate him or her as the person who discharges the employer's duty to provide them." *Id.*

¶ 51 Other courts have also held that services such as those provided by Mrs. Carbajal are not deemed ordinary household duties, but are more in the nature of custodial or nursing duties. E.g., *Don Harris Plumbing Co. v. Henderson*, 454 So.2d 745, 746 (Fla.Dist.Ct.App.1984) (under statute permitting compensation for custodial care by family member if not those normally provided by family members gratuitously, services such as dressing, administering medication, assisting with sanitary functions, assisting in rising and donning therapeutic apparatus are compensable); *Port Gibson Oil Works v. Estate of Hughes*, 823 So.2d 613, 614–16, ¶¶ 1, 5, 9 (Miss.Ct.App.2002) (when employee was restricted to using wheelchair and crutches, wife's dispensing medication, doing massages, assisting him in bathing, getting up at night to change sheets if he had an accident and assisting him in getting from bed to wheelchair and when he fell were compensable as nursing services and were not mere household duties regardless of whether wife willingly performed tasks or whether they were non-technical tasks routinely performed by orderlies or practical nurses); *Stephens v. Crane Trucking, Inc.*, 446 S.W.2d 772, 781–82 (Mo.1969) (wife's providing of care in form of helping husband go to bathroom without braces, putting on and taking off braces, helping him dress himself, shaving and keeping him from falling were above

falling and hurting himself and for checking and adjusting his oxygen tanks in the middle of the

night. *Supra*, ¶ 27.

and beyond services ordinarily performed by one spouse for another); *Breckle v. Hawk's Nest, Inc.,* 980 S.W.2d 192, 193–94 (Mo.Ct.App.1998), *overruled on other grounds by Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 226 (Mo.2003) (reversing denial of award for spouse's services in observing and supervising husband who was apt to fall down, bringing meals to him, getting him dressed and bathing him although husband could walk with a cane; fact that wife was registered nurse did not preclude award of compensation). *See also Henson v. Workmen's Comp. Appeals Bd.,* 27 Cal.App.3d 452, 455–58, 462, 103 Cal. Rptr. 785 (1972) (reversing denial of claim for spouse's services in emptying urinal, helping him bathe, helping him dress, accompanying him to bathroom so he would not fall, providing medications, getting up in middle of night to assist him when he was in pain; court determined services were in the form of practical nursing services and that employer and carrier were not third party beneficiaries to a marriage contract to contend spouse has obligation to provide such care which the employer or carrier would otherwise be obligated to provide). *Cf. A.G. Crunkleton Elec. Co. v. Barkdoll,* 227 Md. 364, 177 A.2d 252, 256 (1962) (broadly construing "nursing" care under workers' compensation statute to encompass care and attendance necessary in each case and as not contemplated by the usual marital relationship and can include practical nursing services).

### 3. Mrs. Carbajal Provides Trained Care

¶ 52 The majority also errs in concluding that Mrs. Carbajal's attendant care was not "medically required" and Mrs. Carbajal was not providing trained care. As the record shows, attendant care in this case was medically required because the treating physician's undisputed testimony was that Mr. Carbajal could never be left alone since he was at risk of injury by falling if he tried to get up and was at risk of choking while eating. While Mr. Carbajal could at times go to the bathroom on his own, he had recently had problems falling and had to have assistance in sitting on the toilet. Mrs. Carbajal received training for some of the care she provided. Moreover, if a third-party attendant, trained or not, provided this care, it is undisputed that it would be and had been paid for by the carrier. This is the same type of on-call care needed and held compensable in *Close, Kraemer* and those myriad other cases finding care provided by a spouse to be compensable as beyond the normal duties of the marital commitment. *Appel,* 67 A.L.R.4th 765, § 9.

¶ 53 Mrs. Carbajal had to be present at all times an insurer-compensated attendant was not present. She had to provide on-call care, had to help her husband get to the bathroom, had to clean urinals and to clean him if he soiled himself, had to remove his brace, had to give him medications, had to set up his food so he did not choke and had to check and adjust his oxygen tanks. Medically, she or someone else had to be there all night to assist Mr. Carbajal to get up and use the bathroom because he was at the risk of falling. *See Downey,* 852 P.2d at 1288–89 (on-call availability was compensable even if caregiver was doing other activities while being available to care for husband if he needed it). The only difference between the care provided by a third-party attendant or assisted living which the insurer did not dispute was compensable, and the attendant care Mrs. Carbajal was providing, was that Mrs. Carbajal was Mr. Carbajal's wife. While the majority claims that the care provided was merely attendant services not requiring any skill, *supra,* ¶ 20, it is undisputed that Mrs. Carbajal had to be trained to move Mr. Carbajal out of bed without injuring him in the middle of the night and had to be trained to monitor his oxygen tanks at night. Moreover, while the majority interprets the physician's testimony as merely requiring unskilled care, the physician's report and testimony clearly stated that some of Mrs. Carbajal's duties required "skilled activity that requires more than just supervision" and his testimony reflected that some of these skilled needs could be met by family members "[i]f they're able to do that." As the physician was careful to emphasize, it was not that Mr. Carbajal's needs at home could be met by unskilled care, only that "not all" of his home needs would require

skilled healthcare provided on a one-on-one basis.

¶ 54 That the services provided here, other than simple family tasks unrelated to Mr. Carbajal's condition, were compensable is supported by the fact Mrs. Carbajal had to leave her full-time work to care for her husband. As one of the leading authorities in workers' compensation points out, this fact, while not essential to the claim, strengthens a conclusion that the care should be compensable. Larson at § 94.03[4][c].[10]

### 4. Public Policy

¶ 55 Finally, the majority's holding is contrary to the public policy underlying the workers' compensation scheme—to place the reasonable expenses relating to compensable injuries on the industry and to ensure the statute is interpreted to make the successful claimant whole. *Aitken*, 183 Ariz. at 392, 904 P.2d at 461; *Dunn*, 177 Ariz. at 194, 866 P.2d at 862. The only difference many of the tasks Mrs. Carbajal undertook to care for Mr. Carbajal's condition and the undisputed compensable care which would have been provided by skilled or unskilled attendants is that Mrs. Carbajal is Mr. Carbajal's spouse. Taken to its logical conclusion, the holding today will permit workers' compensation carriers to deny paid attendant care to claimants on the theory that such paid care is not necessary because it could and should be performed by the claimant's spouse as part

of her spousal duties.[11] Putting aside whether this error would be more manifestly recognized if the caring spouse was a husband who had quit his full-time job to care for his claimant-wife,[12] such a result permits employers and carriers to avoid their responsibility to provide compensation for reasonable and necessary compensable care under the workers' compensation statutes. Regardless of what the ordinary marital duties of spouses may be to care for each other, respondents are not third-party beneficiaries of the marital contract so as to permit them to avoid their duties to provide reasonably necessary "other" treatment. *Henson*, 27 Cal. App.3d at 458, 103 Cal.Rptr. 785.

### CONCLUSION

¶ 56 For all of the above reasons, I would hold that the attendant care services Mrs. Carbajal has provided in lieu of paid attendants or assisted living which are directly related to Mr. Carbajal's injuries, including her on-call assistance at night, are "other treatment" and are compensable under section 23–1062(A).

---

**10.** The majority minimizes this fact by contending that Mrs. Carbajal has time during the day when Mr. Carbajal is at the care center and there was no evidence she sought new work. No one asked Mrs. Carbajal whether she sought a different job at which she could work during the five to six hours Mr. Carbajal is at the care center and she is not seeking compensation for those hours.

**11.** The majority attempts to avoid that result by contending that its conclusion here is limited by the facts in this case. However, the majority's holding cannot be so easily limited; it holds that unless the care is truly medical in nature, all attendant care is noncompensable under the statute if provided by a spouse. Thus, employers and workers' compensation carriers would be

free under that analysis to refuse compensation for any such attendant care even if they would have paid for it if provided by third parties.

**12.** This is not to say or imply that the result of this Court would be different if the roles between husband and wife were reversed, but only to note that the error in holding that such attendant care is part of "marital duties" is made more obvious in traditional views if those roles were switched. One could presume, however, that this result would be different if a married couple entered into a premarital agreement about their duties in case of a compensable injury. Alternatively, Mrs. Carbajal could obtain a divorce and then agree to provide attendant care to Mr. Carbajal but only if compensated for by the workers' compensation carrier.